STROUD, Judge.
*17 Trial courts have a responsibility to enforce the law and to order relief or punishment for willful disobedience of its orders. But courts are not just collection agencies. Trial courts also have a responsibility to consider the basic subsistence needs of an alleged contemnor before determining he has the ability to pay child support as ordered and the ability to pay purge payments. Although the exact details of basic subsistence needs will vary in different cases and the trial court has wide discretion in determining these needs, basic subsistence needs normally will include food, water, shelter, and clothing at the very least. The trial *18 court must make sufficient findings of fact to show that an alleged contemnor has the ability to pay his child support obligation and purge payment for civil contempt after considering his income, assets, and basic subsistence needs.
Defendant appeals two orders[1] entitled as "Order on Civil Contempt" based upon his failure to pay child support and past public assistance arrears from voluntary support agreements entered in 1993. Plaintiff presented no evidence other than the amount of child support arrears or past public assistance owed. Defendant presented substantial evidence of his inability to pay. Because the *844 findings of fact in the orders do not support the trial court's determination that defendant willfully refused to pay or that he had the ability to pay the purge payments for civil contempt, and neither the evidence nor the findings of fact support the trial court's finding that defendant had the ability to satisfy the purge conditions, the trial court erred in holding him in civil contempt. We therefore vacate both orders and remand for entry of new orders.
I. Background
Defendant entered into a Voluntary Support Agreement and Order in File No. 93 CVD 4477 on 9 November 1993 for a child or children born to Tiffany King which required him to pay child support of $97.00 per month and to repay past public assistance of $5,600.00 at the rate of $13.00 per month.[2] We will refer to this case as the King matter. Defendant also entered into a Voluntary Support Agreement and Order in File No. 93 CVD 2822 on 19 November 1993 for his two children born to Sharon Wilson, which required him to pay child support of $203.00 per month starting 1 December 1993 and to repay past public assistance of $2,436.00, to be paid at the rate of $20.00 per month, for a total of $223.00 per month. We will refer to this case as the Wilson matter. Over the years, it appears that defendant's child support obligations in both the Wilson and King matters may have been modified and the amounts of past public assistance to be repaid increased, although he did pay some of his obligations.[3]
*19 On 11 July 2016, plaintiff initiated contempt proceedings against defendant in both cases under N.C. Gen. Stat. § 50-13.9(d). In the Wilson matter, an order to show cause was issued based upon the most recent order of 26 May 2015, with total past due child support of $23,186.69 and $2,136.07 due based on the terms of the last order. In the King matter, an order to show cause was issued based upon the most recent order of 26 May 2015, with total past due child support of $9,138.73 due based on the terms of the last order. Both orders to show cause required defendant to appear on 2 September 2016 to show cause why he should not be held in contempt and to bring to the hearing "all records and information relating to your employment and the amount and source of your disposable income."
On 2 September 2016, defendant appeared in court and applied for a court-appointed attorney; the trial court entered an order continuing the hearing in the Wilson case to 29 September 2016 for "PRETRIAL" and to 18 October 2016 for "Hearing" and appointed counsel for defendant.[4] The case was then continued and the hearing began on 18 October 2016. After hearing a portion of defendant's testimony, the trial court sua sponte subpoenaed defendant's sister to testify and set the completion of the hearing for 15 November 2016. On 15 November 2016, the trial court initially questioned defendant's sister, and then defendant continued presenting his evidence.
The trial court held defendant in willful civil contempt for his failure to pay his child support. On or about 23 November 2016, the trial court entered a two-page "Order on Civil Contempt" in each case. The two orders are identical except for the case captions, file numbers and amounts of arrears stated in Finding No. 4 of each order; we quote Finding No. 4 below from both orders instead of repeating the rest of the order. The orders first find that defendant was in court and represented by counsel and the custodial parent was not in court. All of the remaining findings of fact are:
3. The Defendant has willfully failed and refused to comply with the Order of this Court entered on 2/1/2009.
*845 4. The Defendant as of the date of his hearing is in arrears in the amount of $22,965.89. (Wilson case)
*20 4. The Defendant as of the date of his hearing is in arrears in the amount of $8959.53. (King case)
5. The Defendant is presently able to comply with the Order or to take reasonable measures that would enable the Defendant to comply with the order and pay a purge of $2500.00 for the following reasons:
a. The Defendant owns a boat.
b. The Defendant owns a car.
c. The Defendant spends money on gas.
d. The Defendant spends money on food.
e. The Defendant has medical issues, but they do not prevent him from working.
f. The Defendant prepares and delivers food.
g. The Defendant repairs cars for money.
h. The Defendant pays car insurance in the amount of $147.00 per month.
i. The Defendant receives in kind income from his sister and friends.
j. The Defendant has a cell phone.
The trial court concluded defendant "should be found in direct Civil Contempt per NCGS § 5A, Article 2."[5] The trial court ordered that defendant be immediately taken into custody by the Durham County Sheriff and that he "shall remain in custody for 90 days or until a purge of $2,500.00 is paid into the office of the Clerk of Superior Court of this County." In addition , the trial court ordered: "The Defendant shall serve a 90 [day] sentence consecutive with any other child support contempt orders in this Court."[6] Defendant timely filed notice of appeal from both *21 orders. We will address both orders together since they are identical except for the case captions, file numbers, custodial parent, and findings of amount of arrearages.
II. Analysis
A. Standard of Review
We review orders for contempt to determine if the findings of fact support the conclusions of law: The standard of review we follow in a contempt proceeding is limited to determining whether there is competent evidence to support the findings of fact and whether the findings support the conclusions of law. Spears v. Spears , [245] N.C. App. [260, 272-74], 784 S.E.2d 485, 494 (2016) (citation and quotation marks omitted); see also Watson v. Watson , 187 N.C. App. 55, 64, 652 S.E.2d 310, 317 (2007) ("The standard of review for contempt proceedings is limited to determining whether there is competent evidence to support the findings of fact and whether the findings support the conclusions of law. Findings of fact made by the judge in contempt proceedings are conclusive on appeal when supported by any competent evidence and are reviewable only for the purpose of passing upon their sufficiency to warrant the judgment. North Carolina's appellate courts are deferential to the trial courts in reviewing their findings of fact." (Citations and quotation marks omitted) ).
County of Durham v. Hodges , --- N.C. App. ----, ----, 809 S.E.2d 317, 323 (2018).
B. The absence of evidence is not evidence.
Defendant argues that the trial court failed to make sufficient findings of fact to support a conclusion of law that defendant was in willful contempt and challenges some findings as not supported by the evidence. Defendant contends neither the facts as found by the trial court nor the evidence show he could pay a $5,000.00 purge payment as ordered or that he could pay his monthly obligations.
Plaintiff begins its argument by stating that defendant "was working at the time of *846 trial and therefore his medical issues may have ... been restrictive but did not prevent him from working." Plaintiff does not direct us to any evidence which would indicate that defendant was "working" at the time of trial, and the trial court's order did not make a finding he was "working." Plaintiff does not directly respond to *22 defendant's arguments but simply emphasizes that the trial court is the sole judge of the credibility of the evidence and the trial court apparently did not find defendant's evidence of his medical disability to be credible.
This case is remarkably similar, both factually and legally, to Hodges , which discussed the burden of proof for civil contempt and the required findings of fact:
Proceedings for civil contempt can be initiated in three different ways: (1) by the order of a judicial official directing the alleged contemnor to appear at a specified reasonable time and show cause why he should not be held in civil contempt; (2) by the notice of a judicial official that the alleged contemnor will be held in contempt unless he appears at a specified reasonable time and shows cause why he should not be held in contempt; or (3) by motion of an aggrieved party giving notice to the alleged contemnor to appear before the court for a hearing on whether the alleged contemnor should be held in civil contempt. Under the first two methods for initiating a show cause proceeding, the burden of proof is on the alleged contemnor. However, when an aggrieved party rather than a judicial official initiates a proceeding for civil contempt, the burden of proof is on the aggrieved party, because there has not been a judicial finding of probable cause.
In the present case, the trial court entered an order to show cause, which shifted the burden of proof to defendant to show cause as to why he should not be held in contempt of court. The party alleged to be delinquent has the burden of proving either that he lacked the means to pay or that his failure to pay was not willful.
And despite the fact that the burden to show cause shifts to the defendant, our case law indicates that the trial court cannot hold a defendant in contempt unless the court first has sufficient evidence to support a factual finding that the defendant had the ability to pay, in addition to all other required findings to support contempt.
Hodges , --- N.C. App. at ----, 809 S.E.2d at 324 (citations and quotation marks omitted).
Because of the order to show cause, defendant had the burden of production of evidence to show he was unable to pay his child support *23 as ordered. Id . at ----, 809 S.E.2d at 324. Defendant presented substantial evidence regarding his medical condition, his minimal living expenses, and his lack of income. Plaintiff presented no evidence other than the amount of arrears owed, including any evidence regarding defendant's ability to work, income, potential income, or assets. "[D]espite the fact that the burden to show cause shifts to the defendant, our case law indicates that the trial court cannot hold a defendant in contempt unless the court first has sufficient evidence to support a factual finding that the defendant had the ability to pay, in addition to all other required findings to support contempt." Id . at ----, 809 S.E.2d at 324.
Plaintiff is correct that the trial court is the sole judge of credibility and weight of the evidence, and although the trial court could find defendant's evidence not to be credible, this does not create evidence for plaintiff. The absence of evidence is not evidence. Defendant presented evidence, and even if the trial court determined not one word of it to be true, we are then left with no evidence from plaintiff other than the amount owed. Just as in Hodges , "defendant met his burden to show cause as to why he should not be held in contempt, presenting evidence from [a] treating physician[ ] that he is physically incapable of gainful employment. DSS presented no evidence and did not refute defendant's evidence at all." Id . at ----, 809 S.E.2d at 324. But even based upon Defendant's evidence, it may be possible for the trial court to have determined that Defendant had the ability to pay more than he actually paid.
*847 Defendant need not have the ability to pay his entire support obligation to be held in civil contempt for failure to pay. If he had the ability to pay some of his obligation, but he paid none, or less than he could have paid, he may still be held in contempt. We addressed this type of situation in Spears :
We agree with plaintiff that an interpretation of the cases which would always require a finding of full ability to pay would "encourage parties to completely shirk their court-ordered obligations if they lack the ability to fully comply with them." Yet the cases do not go quite so far as plaintiff suggests. An obligor may be held in contempt for failure to pay less than he could have paid, even if not the entire obligation, but the trial court must find that he has the ability to fully comply with any purge conditions imposed upon him.
The seminal case on this issue from our Supreme Court is Green v. Green , a civil contempt proceeding for *24 nonpayment of alimony, in which the Court held that the trial court's findings of fact were insufficient to support its order that the defendant be imprisoned until he paid the amounts owed in full:
The judge who heard the proceedings in contempt recited the findings of fact made by the judge who granted the order allowing alimony, and added two others, in words as follows: "I further find that said defendant could have paid at least a portion of said money, as provided in said order, and that he has willfully and contemptuously failed to do so. I further find that he is a healthy and able-bodied man for his age, being now about fifty-nine years old." So, notwithstanding the finding of the fact that the defendant was able to pay only a part of the amount ordered to be paid, he was to be committed to the common jail until he should comply with the order making the allowance in the nature of alimony, that is, until he should pay the whole amount. Clearly, the judgment can not be supported on that finding of fact.
Green v. Green , 130 N.C. 578, 578-79, 41 S.E. 784, 785 (1902).
Although the Court in Green did not state this explicitly, it seems that the defendant paid nothing toward his alimony obligation and that the trial court found that he could have paid "at least a portion" of the amounts owed. Id ., 41 S.E. at 785, 130 N.C. 578. Indeed, this sort of vague finding that an obligor could have paid "more" could be made in almost any case where the obligor has paid nothing at all, since most obligors probably have the ability to pay $1.00 per month, for example. Presumably, the defendant in Green had the ability to pay some significant amount but less than the full amount. The problem with the trial court's order in Green was that it went too far with the remedy-despite a finding that the defendant had the ability to pay only a portion of the sums owed, he was imprisoned "until he should pay the whole amount." Id . at 579, 41 S.E. at 785. In addition, we can also infer from this opinion that the only source of the defendant's funds was his labor and that he was "healthy and able-bodied[,]" thus able to work to earn funds to pay the plaintiff, although he could not work while in jail. Id . at 578-79, 41 S.E. at 785. He apparently did not have investments or other sources of funds *25 upon which to draw. See id ., 41 S.E. at 785. Based upon the trial court's findings, the order showed that the defendant had the ability to earn enough income to pay only part of his alimony before he went to jail; while in jail, he would have no ability to pay anything although he was ordered to pay in full. Id ., 41 S.E. at 785. For these reasons, the Court found error. Id ., 41 S.E. at 785.
Green has been followed for over 100 years in both alimony cases and child support cases. These cases are all very fact-specific.
Spears , 245 N.C. App. at 278-80, 784 S.E.2d at 497-98 (citations omitted). We will therefore review the order to determine if the evidence supports the challenged findings of fact and if the findings support the trial court's conclusions of law.
C. Taking the inventory of financial condition
In determining the ability to pay and willfulness of failure to pay child support, the *848 trial court must consider both sides of the equation: income or assets available to pay and reasonable subsistence needs of the defendant. See, e.g., Bennett v. Bennett , 21 N.C. App. 390, 394, 204 S.E.2d 554, 556 (1974) ("Our Supreme Court has indicated ... that the court below should take an inventory of the property of the plaintiff; find what are his assets and liabilities and his ability to pay and work-an inventory of his financial condition-so that there will be convincing evidence that the failure to pay is deliberate and willful." (Citations and quotation marks omitted) ).
Defendant argues that the trial court did not make a "meaningful analysis of [his] income and expenses" in its findings of fact. Defendant contends some findings are not supported by the evidence and others "provided little or no information from which the court could deduce that [defendant] was able to pay more" toward his child support arrears.
The trial court need not find detailed evidentiary facts but an order must have sufficient findings to support its conclusions of law and decretal. There are two kinds of facts: Ultimate facts, and evidentiary facts. Ultimate facts are the final facts required to establish the plaintiff's cause of action or the defendant's defense; and evidentiary facts are those subsidiary facts required to prove the ultimate facts. While a trial court need not make findings as to all of the evidence, it must make the required ultimate findings, and there must be evidence to support such findings.
*26 Hodges , --- N.C. App. at ----, 809 S.E.2d at 323 (citations and quotation marks omitted). We will therefore address defendant's arguments about each of the trial court's findings of fact enumerated as its specific reasons for determining defendant had the ability to pay or to take reasonable measures to enable him to pay.
i. "The Defendant owns a boat."
Defendant does not challenge this finding as unsupported by the evidence. He did own a boat. The trial court made no findings of the type, size, age, value, or condition of the boat. Based on the evidence before the court, defendant received the boat as a gift from a friend and it could be worth as much as $1,500.00. Defendant agreed he would sell the boat. "Reasonable measures" to pay an outstanding judgment could include "borrowing the money, selling defendant's ... property ..., or liquidating other assets, in order to pay the arrearage." Teachey v. Teachey , 46 N.C. App. 332, 335, 264 S.E.2d 786, 787-88 (1980). Selling the boat is a reasonable measure which would enable defendant to pay a portion of the purge payments, or defendant could have sold the boat and used the proceeds to pay some of his outstanding obligation. At most, the finding and the evidence could show defendant's ability to pay the proceeds from the sale of the boat.
ii. "The Defendant owns a car."
Defendant does not challenge this finding as unsupported by the evidence. He did own a car. The trial court made no findings of the make, model, age, condition, or value of the car. Based on the evidence before the court, it was a gift to defendant from a friend and could be worth as much as $1,800.00. Defendant could sell the car, although as defendant contends, then he would not have transportation to go to his medical appointments or therapy, nor would he have transportation to get to a workplace, if his medical restrictions are lifted. At most, this finding and the evidence could show defendant's ability to pay the proceeds from the sale of the car.
iii. "The Defendant spends money on gas."
Defendant does not challenge this finding as unsupported by the evidence. He did buy a little gas. The trial court made no findings about how much gas defendant actually bought or where he got the money for it. Although the trial court need not make findings on each evidentiary fact, this finding-like the others-is too minimal to be meaningful. The evidence before the court was that defendant did not drive very much due to the effects of his medication. When asked how he paid for gas, he *27 testified that he had "a little bitty thing with change in it." He collected "pennies, nickels, dimes, quarters" *849 to pay for gas. He would go to friends occasionally to get "a little $20 here, $30 there." This finding does not show defendant has any financial ability to pay his monthly obligation or purge payments but only that he has a minimal living expense to put gas in his car.
iv. "The Defendant spends money on food."
Defendant does not challenge this finding as unsupported by the evidence. The trial court made no findings about how much defendant spends on food. The evidence before the court showed that defendant often relied on his sister or friends to help with basic subsistence needs such as food.[7] This finding does not show that defendant has any financial ability to pay his support obligation but only that he has a minimal living expense to buy food.
v. "The Defendant has medical issues, but they do not prevent him from working."
First, even if this finding were supported by the evidence, it would not support a determination of ability to pay and willful contempt. The finding does not say what sort of work the defendant could do or how much that work may pay and there was no evidence to support findings of these facts. In this sense, this finding about "work" generally is similar to the findings in prior cases in which far more detailed findings were held to be insufficient:
The only findings of fact relating to plaintiff's ability to pay include:
14. The Plaintiff is an able-bodied, 32 year old, who attended high school up to the tenth grade. He has no military background. His work experience includes running a Tenon machine in the furniture industry. The plaintiff has skills in the furniture industry, but prefers to work in landscaping or construction. The Plaintiff has worked odd-jobs for himself and for others. The Plaintiff has been paid in cash. The Plaintiff worked for 8 months last year as a brick mason for Jones Rock Mason, and earned $8.00 per hour and worked forty-hour weeks, with no overtime.
....
*28 16. The Court finds that the Plaintiff is like an ostrich, burying his head in the sand, in [that] he believes that if he does not see the minor child's medical bills, that he will not have to pay them. The Plaintiff believes ignorance is bliss.
....
18. While [the] Court does not disbelieve that the Plaintiff would prefer to work at an outside job, when a child is in the equation, the Plaintiff has to do what is necessary for the child.
Clark v. Gragg , 171 N.C. App. 120, 124, 614 S.E.2d 356, 359 (2005). These findings addressed the defendant's work experience, physical ability to work, and some actual work he had done and his hourly pay, but this Court reversed the order, remanded "for further findings of fact" and instructed the trial court to "make specific findings addressing the willfulness of plaintiff's non-compliance with the prior consent orders, including findings regarding plaintiff's ability to pay the amounts provided under those prior orders during the period that he was in default." Id . at 126, 614 S.E.2d at 360.
We also noted in Clark that prior cases held similar findings to be insufficient to show ability to pay and willfulness:
Our appellate courts have previously held that almost identical findings are insufficient, standing alone, to support the finding of willfulness necessary to hold a party in civil contempt.
In Mauney , 268 N.C. at 257-58, 150 S.E.2d at 394, our Supreme Court held that the following finding of fact was not a sufficient basis for the conclusion that the non-paying party's conduct was willful in the absence of a finding that defendant had in fact been able to make the required payments during the period in which he was in arrearage: Judge Martin found that the defendant "is a healthy, able bodied man, *850 55 years old, presently employed in the leasing of golf carts and has been so employed for many months; that he owns and is the operator of a Thunderbird automobile; that he has not been in ill health or incapacitated since the date of [the] order [requiring payment of alimony] entered on the 5th day of October, 1964; that the defendant has the ability to earn good wages in that he *29 is a trained and able salesman, and is experienced in the restaurant business; and has been continuously employed since the 5th day of October, 1964; that since October 5, 1964, the defendant has not made any motion to modify or reduce the support payments." Id . at 255, 150 S.E.2d at 392. Likewise, in Hodges v. Hodges , 64 N.C. App. 550, 553, 307 S.E.2d 575, 577 (1983), this Court reversed an order for civil contempt because [o]ur Supreme Court has held that a trial court's findings that a defendant was healthy and able-bodied, had been and was presently employed, had not been in ill-health or incapacitated, and had the ability to earn good wages, without finding that defendant presently had the means to comply, do not support confinement in jail for contempt. Id . See also Yow v. Yow , 243 N.C. 79, 84, 89 S.E.2d 867, 871-72 (1955) (setting aside civil contempt decree when the trial court found only that the defendant was employed as a manager of a grocery and did not specifically find that the defendant possessed the means to comply with the prior orders during the period that he was in default).
Clark , 171 N.C. App. at 124-26, 614 S.E.2d at 359-60.
But defendant also challenges this finding of his ability to work as unsupported by the evidence. The only evidence before the court regarding defendant's medical condition was his testimony, his sister's testimony, and the letter from defendant's physician. The evidence showed that defendant was injured when he fell from a roof while doing roofing work in 2013. Defendant testified that he had fallen "14 feet onto a brick foundation" and "that messed me up pretty bad." He kept trying to work after the accident but in the "last three, four years" the doctor "said no more working." He testified that since the accident, he had been in pain and had to take "strong medication" which "knocks me out" so he could not work while taking it. Without objection from plaintiff, defendant entered into evidence a letter from Dr. Amir Barzin, Director of Family Medicine Inpatient Service at UNC Healthcare. Dr. Barzin wrote that he had been defendant's primary care physician since October 2013. Dr. Barzin stated that he had been working with defendant to try to "control issues that have been related to pain and injury" and that he was on work restrictions. Defendant was being seen in UNC Healthcare's "Physical Medicine and Rehabilitation Department" as well. Dr. Barzin reevaluated his work restrictions at each visit and noted that "when he is able to work with limited pain the restriction will be lifted." Defendant *30 also testified about a burn injury to his right arm and his back "from half way down to my lower back." Defendant is right-handed. He received second and third degree burns in a grease fire in 2003 and his "forearm swells up."
Considering all of the findings of fact and the transcript of the trial, including the trial court's comments, it appears that this finding meant that defendant had the ability to "work" only in the sense he was physically able to do some household tasks such as laundry or cooking. For purposes of ability to pay child support, the ability to "work" means more than the ability to perform some personal household tasks; it means the present ability to maintain a wage-paying job. See generally Self v. Self , 55 N.C. App. 651, 653-54, 286 S.E.2d 579, 581 (1982) ("While the evidence establishes that defendant was physically able to work, it does not establish that work was available to him. ... Absent evidence refuting testimony that failure to pay as ordered was due to lack of financial means, the record does not support a finding that the failure was willful."). A defendant need not be completely incapacitated to be considered as unable to "work." See, e.g., Brandt v. Brandt , 92 N.C. App. 438, 444, 374 S.E.2d 663, 666 (1988) ("The trial court considered this evidence and concluded that the plaintiff's medical condition prevented her from undertaking any meaningful employment and that she is unable to work and *851 earn income to defray her own expenses. This conclusion is supported by the testimony of the plaintiff."), aff'd per curiam , 325 N.C. 429, 383 S.E.2d 656 (1989).
In addition, the trial court's comments indicate some potential misapprehension of the law regarding the relevant time for defendant's ability to work. The defendant must be currently able to comply with the order to be held in civil contempt, see, e.g. , Teachey , 46 N.C. App. at 334, 264 S.E.2d at 787 ("For civil contempt to be applicable, the defendant must be able to comply with the order or take reasonable measures that would enable him to comply with the order. We hold this means he must have the present ability to comply, or the present ability to take reasonable measures that would enable him to comply, with the order."); a defendant may be held in criminal contempt as punishment for an act committed in the past , when he had the ability to comply, even if he no longer has the ability, but not civil contempt. See, e.g., O'Briant v. O'Briant , 313 N.C. 432, 434, 329 S.E.2d 370, 372 (1985) ("A major factor in determining whether contempt is civil or criminal is the purpose for which the power is exercised. When the punishment is to preserve the court's authority and to punish disobedience of its orders, it is criminal contempt. Where the purpose is to provide a remedy for an injured *31 suitor and to coerce compliance with an order, the contempt is civil."). A person cannot be held in both civil and criminal contempt for the same conduct. See N.C. Gen. Stat. § 5A-21(c). This is a crucial distinction.[8]
Civil contempt and criminal contempt are distinguishable. It is essential to the due administration of justice in this field of the law that the fundamental distinction between a proceeding for contempt under G.S. 5-1 and a proceeding as for contempt under G.S. 5-8 be recognized and enforced. The importance of the distinction lies in differences in the procedure, the punishment, and the right of review established by law for the two proceedings.
... Criminal contempt is a term applied where the judgment is in punishment of an act already accomplished, tending to interfere with the administration of justice. Civil contempt is a term applied where the proceeding is had to preserve and enforce the rights of private parties to suits and to compel obedience to orders and decrees made for the benefit of such parties. Resort to this proceeding is common to enforce orders in the equity jurisdiction of the court, orders for the payment of alimony, and in like matters.
Mauney v. Mauney , 268 N.C. 254, 256, 150 S.E.2d 391, 393 (1966) (citations, quotation marks, and ellipses omitted).
When defendant was testifying about his medical condition, the trial court noted that defendant had previously been held in contempt in 2015-after his 2013 fall from a roof-so he must have had the ability to work in 2015[9] :
*32 THE COURT: Well, ma'am, in 2015, he was held in contempt and had the ability to make the payments, so I guess why are we going back and revisiting that issue, since I don't have any medical-there's no medical *852 issue that he-that's preventing him from working, and that seems to me he was found in willful contempt in March-on May the 26th, 2015, by this Court. So if you could help me to understand why we're re-addressing that issue.
MS. WATKINS: Well, yes, Your Honor. I'm not sure it was entered into evidence at that time, however the injury continues and continues to prevent him from working.
Even if defendant was physically able to work at a wage-paying job in 2015, his former ability to work would not mean he was still able to work at the time of the hearing. Dr. Barzin's letter was dated 10 October 2016. Dr. Barzin did not say when defendant's work restrictions began but did say that he currently could not work.
Because the trial court determines the credibility and weight of the evidence, it is possible the trial court may be able to make more specific findings regarding defendant's actual ability to work as of the date of the hearing and earnings from his work, so we must remand for additional findings as discussed by Clark , 171 N.C. App. at 126, 614 S.E.2d at 360.
vi. "The Defendant prepares and delivers food."
Defendant challenges this finding as unsupported by the evidence. It is not clear what this finding means; certainly defendant did not operate a catering business. The entirety of evidence about defendant's preparation and delivery of food was defendant's sister's testimony in response to the trial court's question, "What can you tell me about him?"
Well, he's a good person, he's a kind-hearted person. He'll do anything for anybody. In fact, I visit nursing homes, facilities, homes. I'm at work and I'll call him ask him if he'd fix food for me, at times, to take it to nursing homes to different people, people that we know, people we do not know. He's always been there when there are funerals or anything, I can call on him and he'll cook for me.
There was not a scintilla of evidence that defendant was ever paid for any food nor any evidence he ever worked in any sort of food service *33 employment. Generally, people do not charge a fee for food they have prepared for a family member or to take to someone in a nursing home or to a funeral. Again, this finding does not demonstrate defendant's ability to work at a wage-paying job or his ability to pay child support or the purge payments.
vii. "The Defendant repairs cars for money."
Defendant challenges this finding as unsupported by the evidence. Defendant is correct there was no evidence he earned income from car repairs. The entire evidence which could relate to car repair was his sister's following testimony:
Q. Do you know whether or not he sells vehicles like junk cars?
A. He put-He fix [sic] cars, and there are times I helped him. There are times, yes.
As defendant notes, the meaning of "fix" in this quote is uncertain, since there was no evidence he repaired cars. The only evidence was that he sold junk cars. Junk cars are, by definition, beyond repair. Defendant had earlier testified that some friends had given him some junk cars which he then sold to generate funds to pay toward his child support obligations. He testified:
A. I'm just messing around with, you know, friends of mine that had cars and I will get those and sell them to the junk man. But about three or four months ago I did-every little money I had I was sending it in. It was like maybe $30, but I sent it to Raleigh, and that's what they told me last time for the last three or four months to sent one [sic] to Raleigh.
Q. And how much are you getting when you're selling these junk cars?
A. I don't get like maybe $100, $120 or whatever I get.
Q. And how many have you sold in October?
A. I think it was like two, three something like that.
*853 Q. So you received about two to three hundred dollars this month.
A. Yeah. And the money that I had I had to have the receipts for it, and I did send that in, the money order to Raleigh.
*34 To the extent that the trial court may have meant this finding to address the type of "work" defendant may have the ability to perform, it is not sufficient to show that he had the ability to pay. Whether defendant repaired a car or just sold a junk car, the trial court's finding does not indicate that defendant was paid, or could be paid, for anything he did to a car. This finding does not show that defendant had the ability to pay his monthly obligations or purge payments.
viii. "The Defendant pays car insurance in the amount of $147.00 per month."
Defendant challenges this finding as unsupported by the evidence because by the time of the second hearing date, defendant had cancelled his car insurance. But even if the trial court did not find defendant's testimony he cancelled his insurance to be credible, this finding indicates only that defendant had a basic living expense required by law for him to continue to operate his car.
ix. "The Defendant receives in kind income from his sister and friends."
Defendant challenges this finding as unsupported by the evidence but acknowledges there was evidence that defendant's sister and friends had assisted defendant with paying essential bills such as utilities. But as defendant notes, there is no finding of the "circumstances, regularity, and the amount of 'in kind' income" and "no context for determining whether those contributions enabled [defendant] to eke [sic] out anything beyond his essential living expenses." Defendant's characterization of the finding is accurate. The evidence showed only that some friends had assisted defendant by giving him something, such as the junk cars to sell or the boat or his car, and that his sister assisted him at times with paying bills in varying amounts.
This Court has discussed the type of financial support from others which may be "in kind" income for purposes of establishing child support, see generally Spicer v. Spicer , 168 N.C. App. 283, 288-89, 607 S.E.2d 678, 682-83 (2005), so this analysis is helpful for determining ability to pay child support for purposes of contempt as well. Generally, evidence must show the amount of the support and that it is given on a regular basis:
The Guidelines include as "income" any "maintenance received from persons other than the parties to the instant action." Guidelines, 2005 Ann. R. N.C. 48. "Maintenance" is defined as "[f]inancial support given by one person to *35 another...." Black's Law Dictionary 973 (8th ed. 2004). As our appellate courts have previously recognized, cost-free housing is a form of financial support that may be considered in determining the proper amount of child support to be paid. See Guilford County ex rel. Easter v. Easter , 344 N.C. 166, 171, 473 S.E.2d 6, 9 (1996) (voluntary support by maternal grandparents, including cost-free housing, properly considered in determining child support); Gibson v. Gibson , 24 N.C. App. 520, 522-23, 211 S.E.2d 522, 524 (1975) (evidence that employer supplied father with automobile and rent-free apartment that reduced his living expenses was evidence of "additional income" from his job beyond his salary). See also 2 Suzanne Reynolds, Lee's North Carolina Family Law § 10.8 at 533 (5th ed. 1999) (included in income are "in-kind payments, such as a company car, free housing or reimbursed meals, if they are significant and reduce personal living expenses"). We therefore hold that the trial court did not err in including the $300.00 per month value of Mr. Spicer's housing as income.
Spicer , 168 N.C. App. at 288-89, 607 S.E.2d at 682-83.
None of the evidence here shows a regular or consistent amount or type of assistance defendant has received from others and thus it cannot support a finding of his ability to pay his ongoing obligation or purge payments.
*854 x. "The Defendant has a cell phone."
The defendant does not challenge this finding as unsupported by the evidence. Once again, there is no finding of the cost of the cell phone, although the evidence showed that defendant's monthly bill was $42.00. Having a cell phone does not show defendant's ability to pay but instead is a basic living expense. Defendant notes this finding illustrates the "trial court's dogma that any living expense [defendant] paid reflected a dereliction of his duty to pay off his child support." Just as with the findings that defendant pays for gas, food, and car insurance, this finding shows only that defendant has a living expense but does not indicate an ability to pay.
D. Failure to consider living expenses
The central deficiency of the trial court's order is the complete failure to consider defendant's living expenses. This is apparent even *36 if we treated all of the findings as correct. The trial court made no finding regarding the value of the defendant's car or boat but required him to sell these items. Defendant acknowledged he should sell the boat, but without a car (with liability insurance required by law) and some gas, defendant would have no transportation to get to doctor appointments or to work, should he ever be released from his medical work restrictions.
To determine the ability to pay, the trial court must "take an inventory of the property of the [defendant]; find what are his assets and liabilities and his ability to pay and work-an inventory of his financial condition-so that there will be convincing evidence that the failure to pay is deliberate and willful." Bennett , 21 N.C. App. at 394, 204 S.E.2d at 556 (citations and quotation marks omitted). Only then can the trial court determine if the defendant's failure to pay is willful. Id . Based upon the evidence, the trial court must do an inventory considering defendant's income, or ability to earn, if the trial court makes the required finding of fact to impute income to defendant. See, e.g., Lasecki v. Lasecki , 246 N.C. App. 518, 523, 786 S.E.2d 286, 291 (2016) ("The trial court may impute income to a party only upon finding that the party has deliberately depressed his income or deliberately acted in disregard of his obligation to provide support[.]" (Citation and quotation marks omitted) ).
Our dissenting colleague takes the position that the expense side of the financial inventory of a parent under obligation to pay child support can include only food, water, clothing, and shelter as legitimate needs for subsistence, and all expenses beyond this are unnecessary and unreasonable. This position is not supported by prior precedent or the practical needs of a parent to allow the parent to have the ability to work and support the child. The financial inventory must consider both sides of the equation: the defendant's income, assets, or ability to take reasonable means to obtain funds to pay support minus the defendant's legitimate reasonable needs and expenses.[10] The defendant has the ability to pay only to the extent that he has funds or assets remaining after those expenses.
*37 The trial court has broad discretion to determine which expenses are reasonable and necessary, but depending upon the facts of the particular case, those expenses may include more than the basic subsistence needs of food, clothing, water, and shelter. The extent of the legitimate needs of the obligor is in the discretion of the trial court because in some cases, it would be to the child's detriment to ignore the obligor's needs beyond food, water, clothing, and shelter. For example, an obligor who lives and works in an urban area with reliable public transportation may not need a car to get to work, to get to medical appointments, or to visit with or transport a child-although he would still need funds to pay for the public *855 transportation. But an obligor who lives in an area without public transportation and has a job which requires transportation normally must have a car or he will be unable to work. If he loses his job, he will not be able to pay child support. Owning and operating a car requires certain expenses, including liability insurance, gas, and maintenance such as oil changes and new tires. This is why the trial judge has the discretion to determine if an obligor needs a car and the reasonable expenses for the car.
This opinion does not hold that liability insurance, gas, or a cell phone are necessities for anyone, including defendant. But it is apparent from the trial court's order that it considered all of these items, along with food, as disposable assets instead of living expenses. The trial court did not consider defendant's legitimate need for anything-even food, water, clothing, or shelter. On remand, the trial court may determine that defendant has no legitimate need for a means of transportation or communication, but the trial court must at least consider the possibility that these expenses might be reasonable needs.
Here, the evidence presented does not support a finding that defendant had the ability to pay the purge payments ordered by the trial court. Defendant's assets were a car, worth at most $1,800.00, and a boat, worth roughly $1,500.00. The total value is $3,300.00. If defendant sold both of his assets for his estimated value, he would still not have sufficient funds to pay the $5,000.00 purge. The trial court must consider defendant's financial condition, including reasonable expenses for subsistence, as part of the determination of his ability to pay his regular obligation as well as purge conditions. The trial court's findings do not address how much income defendant has, if any, or how much his subsistence expenses are. There was some evidence that defendant had received some money from selling a few junk cars which were given to him. He testified he made about $200.00 to $300.00 one month, but the trial court must be able to make findings which demonstrate his ability *38 both to subsist and to pay his obligations, or some portion of the obligations if not the entire amount. The trial court must also make findings of how much defendant has actually paid, as there was evidence that he had made some payments, and compare this to the amount he had the ability to pay. The order does not address defendant's payments at all.
We also recognize there were two orders entered, and that the purge payment in each order was $2,500.00. If defendant sold the car and the boat, he would have enough to pay one purge payment. But the two orders were entered on the same date as a result of the same hearing, both require the same purge payment, and the term of imprisonment in each was consecutive to any other order. Practically speaking, this means defendant would have to pay $5,000.00 to purge his contempt for both orders. The trial court could not logically find that defendant was able to pay the purge payment in both orders, even if it could have found him able to pay in one of the orders. After selling both the car and the boat and paying one purge payment, defendant would have only a portion of the purge payment for the other order. Yet a finding of ability to pay some portion of the purge payment is not sufficient. Even if the defendant owns some property or has some income, the actual value of that property or the amount of income must be sufficient to satisfy the purge conditions. See Jones v. Jones , 62 N.C. App. 748, 749, 303 S.E.2d 583, 584 (1983) ("While the evidence tends to show that defendant was gainfully employed as a construction worker at an hourly wage of $5.75 and that he lives with his second wife who also is gainfully employed with an average take-home pay of approximately $406.00 per month and that the defendant and his wife reside in a trailer situated on some 'land' given to defendant by his present father-in-law and that the trailer is heavily mortgaged and that monthly mortgage payments are $250.00 and that the mortgage will be paid in six years and that defendant owns an automobile which is 'broken,' there is no evidence in this record that defendant actually possesses $6,540.00 or that he has the present ability to take reasonable measures that would enable him to comply, with the order." (Citation and quotation marks omitted) ).
*856 III. Conclusion
Because the existing evidence does not support the findings of fact, and the findings of fact do not support the trial court's conclusions that defendant had the ability to pay either his ongoing obligations or his purge payments in the Wilson and King cases, we vacate both orders. We remand for entry of new orders including the required findings of fact, including but not limited to the defendant's reasonable living expenses, and conclusions of law for contempt and his present ability to pay the *39 full amount of any purge payments ordered. The trial court may, in its discretion, receive evidence on remand.[11]
VACATED and REMANDED.
Judge HUNTER concurs.
Judge TYSON concurs in part and dissents in part.

On 31 May 2017, defendant filed a motion to amend and supplement the record on appeal, which was granted on 14 June 2017. The original record contains the Order on Civil Contempt entered on behalf of Sharon Wilson, while the supplement contains the Order on Civil Contempt entered on behalf of Tiffany King.

Our record does not include the entire Voluntary Support Agreement but does include these numbers which are not in dispute.

Defendant's entire payment history over the prior twenty-three years and modifications were not in our record, but those details are not necessary for the issues presented on appeal.

Our record does not include a similar order for the King case but based upon the later orders and hearing transcript it appears the two cases were heard simultaneously.

North Carolina General Statutes Chapter 5A, Article 2 deals with Civil Contempt. Civil contempt is neither "direct" nor "indirect." See generally N.C. Gen. Stat. § 5A-21 (2017). North Carolina General Statutes Chapter 5A, Article 1 deals with Criminal Contempt, which may be either direct or indirect. See N.C. Gen. Stat. § 5A-13 (2017). The trial court specifically concluded defendant was in civil contempt based on Article 2.

Since two orders were entered on the same day with this same provision, defendant was effectively sentenced to a fixed term of imprisonment of 180 days.

We take judicial notice that people must have some food to eat or they will starve to death, and they usually have to buy this food.

These comments are not the only reason we note the distinction between civil and criminal contempt. The orders both found defendant in "direct civil contempt" and imposed fixed term of imprisonment of 90 days for each case, to be served consecutively, for a total of 180 days imprisonment. A fixed term of imprisonment is a proper sanction for criminal contempt , but not for civil contempt. See N.C. Gen. Stat. § 5A-22(a) (2017) ("A person imprisoned for civil contempt must be released when his civil contempt no longer continues."). This fixed term of imprisonment was in addition to civil contempt imprisonment which defendant could purge by paying $2,500.00 for each order. In other words, defendant would remain in jail for at least 180 days (a criminal contempt sanction) even if he immediately paid the $5,000.00 in purge payments (a civil contempt sanction). "A person who is found in civil contempt under this Article shall not, for the same conduct, be found in criminal contempt under Article 1 of this Chapter." N.C. Gen. Stat. § 5A-21(c).

The "Commitment Order for Civil Contempt-Child Support," on Form AOC-CV-603, Rev. 3/03, from 26 May 2015 is in our record on appeal. None of the boxes on the form are checked and it has no findings of fact or conclusions of law. It simply orders defendant's imprisonment for civil contempt and sets a purge payment. It is nearly identical to the order entered in Hodges , --- N.C. App. at ----, 809 S.E.2d at 320.

The trial court did not find that defendant was malingering, spending excessively, acting in bad faith, suppressing his income, or hiding assets, and the trial court did not impute income to defendant. See Ellis v. Ellis , 126 N.C. App. 362, 364, 485 S.E.2d 82, 83 (1997) ("It is clear, however, that before the earnings capacity rule is imposed, it must be shown that the party's actions which reduced his income were not taken in good faith." (quotations, brackets, and citation omitted) ).

On remand, if the trial court holds defendant in civil contempt, new evidence will be necessary to determine if defendant has the present ability to pay any purge payments ordered.